1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

----oo0oo----

11

12

| | |
|---|---|
| GENERAL CHARLES "CHUCK" YEAGER, (RET.), and GENERAL CHUCK YEAGER FOUNDATION, | NO. CIV. 2:08-102 WBS JFM |
| Plaintiffs, | MEMORANDUM AND ORDER RE: MOTION FOR SUMMARY JUDGMENT |
| v. | |
| CONNIE BOWLIN, ED BOWLIN, DAVID MCFARLAND, AVIATION AUTOGRAPHS, a non-incorporated Georgia business entity, BOWLIN & ASSOCIATES, INC., a Georgia corporation, INTERNATIONAL ASSOCIATION OF EAGLES, INC., an Alabama corporation, SPALDING SERVICES, INC., and DOES 1 through 100, inclusive, | |
| Defendants. | |

----oo0oo----

        Plaintiffs General Charles "Chuck" Yeager, (Ret.)

("Yeager") and the General Chuck Yeager Foundation ("Foundation")

filed this lawsuit alleging various claims against defendants

1

Connie Bowlin, Ed Bowlin, David McFarland, Aviation Autographs,
Bowlin and Associates, Inc. ("B&A"), Spalding Services, Inc., and
International Association of Eagles, Inc.  Currently before the
court is defendants Connie Bowlin, Ed Bowlin, Aviation
Autographs, and B&A's motion for summary judgment pursuant to
Federal Rule of Civil Procedure 56.[1]

I.   Summary Judgment Standard

        Summary judgment is proper "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  A material fact is one that could affect
the outcome of the suit, and a genuine issue is one that could
permit a reasonable jury to enter a verdict in the non-moving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  The party moving for summary judgment bears the
initial burden of establishing the absence of a genuine issue of
material fact and can satisfy this burden by presenting evidence
that negates an essential element of the non-moving party's case.
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
Alternatively, the moving party can demonstrate that the
non-moving party cannot produce evidence to support an essential
element upon which it will bear the burden of proof at trial.
Id.

---

[1]    Defendants David McFarland, International Association
of Eagles. Inc., and Spalding Services, Inc. have not been served
in this action.  As it has been well over 120 days since the
Second Amended Complaint was filed, discovery is closed, and the
law and motion deadline has passed, these defendants must be
dismissed from this action.  See Fed. R. Civ. P. 4(m).

1    Once the moving party meets its initial burden, the
2    non-moving party "may not rely merely on allegations or denials
3    in its own pleading," but must go beyond the pleadings and, "by
4    affidavits or as otherwise provided in [Rule 56,] set out
5    specific facts showing a genuine issue for trial."  Fed. R. Civ.
6    P. 56(e); Celotex Corp., 477 U.S. at 324; Valandingham v.
7    Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).  In its inquiry,
8    the court must view any inferences drawn from the underlying
9    facts in the light most favorable to the nonmoving party, but may
10   not engage in credibility determinations or weigh the evidence.
11   Anderson, 477 U.S. at 255; Matsushita Elec. Indus. Co., Ltd. v.
12   Zenith Radio Corp., 475 U.S. 574, 587 (1986).

13   II.  Evidentiary Objections

14       Despite the frustrations repeatedly expressed by this
15   and other courts,[2] the practice of cluttering the record with
16   unnecessary evidentiary objections in connection with summary
17   judgment motions appears to have become institutionalized.  In
18   this case for example, plaintiffs filed 86 separate evidentiary
19   objections to defendants' proffered evidence and declarations in
20   support of the motion, contending that many of the submitted
21   facts are "irrelevant," lack personal knowledge, or are supported
22   by evidence which is hearsay.  Not to be outdone, in reply,
23   defendants filed 57 evidentiary objections to the declarations
24   submitted by plaintiffs in their opposition.

25       At trial, most lawyers do not object to questions when
26

27       [2]   See Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d
28   1110, 1118-22 (E.D. Cal. 2006); Marceau v. International Broth.
     Of Elec. Workers, 618 F. Supp. 2d 1127, 1141 (D. Ariz. 2009).

1   the answers are not likely to be damaging to their client's

2   position in the case or where it is clear that the information

3   sought by the question can eventually be elicited by proper

4   questioning.  Not so in the context of a summary judgment motion.

5   In that context, lawyers routinely make every conceivable

6   objection to the statements contained in a declaration submitted

7   by the other party.  Just as an example, in this case defendants

8   object to the statements in Yeager's declaration to the effect

9   that Dave McFarland made the F-15 print and First Day Covers,

10  that Yeager sent McFarland the prints so that McFarland could

11  sell them for Yeager, and that the Bowlins found the warehouse

12  where McFarland stored the Hey Pard and F-15 prints and First Day

13  Covers.  All of these statements are perfectly consistent with,

14  and indeed would tend to support, defendants' interpretation of

15  the facts.

16          The court perceives at least two reasons for this

17  difference in practice.  First, in the setting of a jury trial,

18  counsel run the risk of antagonizing the jury by repeatedly

19  making unnecessary objections.  An irritated jury might retaliate

20  by deciding the case against their client.  In the context of a

21  summary judgment motion, however, lawyers are entitled to assume

22  that even an irritated judge will decide the motion on its merits

23  and will not retaliate against them.

24          Second, particularly in the larger law firms, the

25  lawyer or lawyers who prepare the materials in support of, or in

26  opposition to, motions for summary judgment are typically not the

27  same lawyers who will try the case.  The task of combing through

28  the opponent's declarations and looking for evidentiary

4

objections may seem to be one that is easily turned over to an associate who does not need to have any trial experience or particular knowledge of the case.  Even when the trial attorney does have a hand in preparing the motion or opposition, that attorney typically has not fully developed his or her trial strategy by the time the motion for summary judgment is briefed.  Accordingly, not wishing to waive <u>any</u> conceivable objection the trial attorney may want to eventually make at trial, the attorneys heed the admonition of the Rutter Group:

> Failure to object as waiver: Evidentiary objections must be raised, either orally or in writing, at or before the hearing.  Otherwise such objections are deemed waived.[3]

William W. Schwarzer, et al., <u>California Practice Guide: Federal Civil Procedure Before Trial</u> § 14:111 (2009).

The problem with this practice is not just that it frustrates judges.  It frustrates the very purpose of Rule 56 of the Federal Rules of Civil procedure by turning summary judgment practice from an inquiry into whether there are truly disputed issues of material fact into a contest to determine which side can come up with the most sustainable evidentiary objections.  If the rulings on the evidentiary objections result in the motion being denied, the case will of course proceed to trial.  If those

---

[3]    That advice, as this court reads it, refers to whether the objection will be waived on appeal, not to whether it will be waived at trial.  <u>See</u> <u>FDIC v. New Hampshire Ins. Co.</u>, 953 F.2d 478, 484-85 (9th Cir. 1991).  To this court's knowledge, failure to object to evidence presented in connection with a summary judgment motion does not waive any objection to that evidence at trial.  <u>See</u> <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 118 (2d Cir. 2004) (noting in connection with an appeal from an order granting summary judgment that on remand "at trial, plaintiffs are free to reiterate their objections to [the district court's evidentiary] rulings").

1  rulings result in the motion being granted, the matter will

2  proceed to appeal, where the trial court's rulings on each of the

3  objections can be scrutinized, presumably under *de novo* review,

4  by the Court of Appeals.

5       While this focus on the technical compliance of the

6  declarations with the Federal Rules of Evidence does not appear

7  to be in the spirit of Rule 56, or what the Supreme Court

8  contemplated when it clarified the summary judgment procedure in

9  <u>Celetex</u>, <u>Anderson</u>, and <u>Matsushita</u>, it is what has evolved in

10 practice and what the parties have invited in this case.

11 Accordingly, the court will proceed to rule upon the parties'

12 evidentiary objections.

13      In the interest of brevity, as the parties are aware of

14 the substance of their objections and the grounds asserted in

15 support of each objection, the court will not review the

16 substance or grounds of all the objections here.  Plaintiffs'

17 objections 1-5, 7, 9-12, 14-18, 20-23, 26-28, 30-33, 35, 38, 40,

18 42, 44, 46-47, and 49-86 are overruled.  Plaintiffs' objections

19 4, 8, 13, 19, 24-25, 29, 34, 36-37, 41, 43, 45, and 48 are

20 sustained.  Defendants' objections to the Declaration of General

21 Yeager 1, 2, 10, and 22-23 are overruled.  Defendants' objections

22 to the Declaration of Charles Yeager 3-9, and 11-21 are

23 sustained.  Defendants' objections to the Declaration of Victoria

24 Yeager 1-4, 6, 14, 31, and 35 are overruled.  Defendants'

25 objections to the declaration of Victoria Yeager 5, 7-13, 15-30,

26 and 32-34 are sustained.

27 III. <u>The Sham Affidavit Rule</u>

28      In addition to their evidentiary objections, defendants

6

contend that certain portions of plaintiffs' declarations should be excluded from consideration by the "sham affidavit rule." "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." <u>Kennedy v. Allied Mut. Ins. Co.</u>, 952 F.2d 262, 266 (9th Cir. 1991).  This is because "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." <u>Id.</u> at 266 (quoting <u>Foster v. Arcata Assocs., Inc.</u>, 772 F.2d 1453, 1462 (9th Cir. 1985)).

The sham affidavit rule may be invoked only if a district court makes "a factual determination that the contradiction was actually a sham" and "the inconsistency between a party's deposition testimony and subsequent affidavit . . . [is] clear and unambiguous." <u>Van Asdale v. Int'l Game Tech.</u>, 577 F.3d 989, 998-99 (9th Cir. 2009) (internal quotations marks, citations omitted).  Accordingly, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." <u>Messick v. Horizon Indus.</u>, 62 F.3d 1227, 1231 (9th Cir. 1995).  Yeager and Victoria Yeager each submitted a declaration in opposition to defendants' motion for summary judgment portions of which defendants contend ought to be striken as sham.

7

A.   <u>Yeager Declaration</u>

At his deposition, Yeager stated that he did not recall answers to approximately 185 different questions, including questions that go to the heart of this action.  (<u>See</u> Noonan Decl. Ex. B.)  For instance, Yeager indicated he did not recall what concerns he had about the Bowlins selling the Gathering of the Eagles prints, whether any agreement existed between himself and the Bowlins, whether the Bowlins made any misrepresentations to him concerning their sale of his memorabilia, whether he entered an agreement with the Bowlins concerning the development of the Leiston Legends print or attended the Tribute to the Aces, whether the Bowlins are selling the Hey Pard print, what is illegal about the Bowlins' use of his name, and other critical issues in the case.[4]  (Gen. Yeager Depo. 13:17-19, 20:10-21, 21:1-5, 29:21-30:11, 31:13-22, 42:11-17, 66:7-17, 94:19-22.)

However, in Yeager's Corrected Declaration, he now states that he is able to recall these same matters in detail after "having his recollection refreshed," including the amount he typically charged for signing items, the oral agreements he made with the Bowlins, and his participation in the Tribute to Aces.  (<u>See</u> Gen. Yeager Corrected Decl. ¶¶ 16, 21, 22-26, 27.) It is clear that Yeager's declaration is a sham.  In his declaration, Yeager gives no explanation as to why he suffered from such extensive memory loss at his deposition, other than to

_____

[4]   Especially troubling is that Yeager seemed to be unable to recall significant, and what would be unforgettable events for many, such as testifying in the earlier state court action against his children, his initial complaint in this action, or even his involvement in a plane crash in the Bowlins' aircraft. (Gen. Yeager Depo. 14:7-15:13, 22:17-23:10, 46:19-22.)

say his recollection was refreshed by a series of documents which are not attached to his declaration. (<u>Id.</u> ¶ 14.)  This claim is unbelievable given that Yeager was shown over twenty exhibits during his deposition in an attempt to refresh his recollection, but was consistently unable to recall any of the matters now elaborated on in his declaration. (<u>See, e.g.</u>, Yeager Depo. 14:7-25; 19:7-20:6; 21: 10-22:2; 23:17-26:20; 38:24-40:3; 41:1-42:17; 44:9-25; 45:10-46:22; 55:7-21; 57:9-58:2; 62:14-63:7; 65:7-17; 66:7-17; 67:10-68:3; 69:9-70:17; 70:21-71:11; 71:15-72:17; 72:20-73:10; 73:13-74:4; 78:4-24; 83:22-84:12; 94:2-95:10.)  This is not a case of a simple misunderstanding of a few questions that requires additional explanation, but instead one where Yeager repeatedly refused to answer <u>hundreds</u> of material questions.

Just because Yeager's responses at his deposition were to the effect that he did "not recall" certain events does not mean those responses do not contradict his later recollection of those same events.  Courts have found that the sham affidavit rule may be applied when a matter that a witness fails to remember during a deposition is then remembered with clarity in an affidavit used to defeat summary judgment.  <u>Mitchael v. Intracorp, Inc.</u>, 179 F.3d 847, 854-55 (10th Cir. 1999); (finding an affidavit from a witness that "more clearly recalled discussions and meetings" that the witness could not remember during his deposition "arguably contradicted his deposition" and therefore "represent[ed] an attempt to create a sham issue of fact"); <u>accord</u> <u>Juarez v. Utah</u>, 263 Fed. Appx. 726, 735-36 (10th Cir. 2008) (excluding plaintiff's affidavit referencing racial slurs used against her as a sham affidavit because she stated she

1  could not recall any such slurs at her deposition); <u>see</u> <u>also</u>
2  <u>Gilani v. GNOC Corp.</u>, No. 04-CV-2935 (ILG), 2006 WL 1120602, at
3  *3 (E.D.N.Y. April 26, 2006) (applying the sham affidavit rule
4  when plaintiff "admitted in her deposition she did not recall
5  seeing the cleaning staff before she entered the restroom" but
6  then recalled that she did see a staff member in an affidavit
7  with "no other evidence corroborating the recollection.")

8       Yeager's declaration is far more questionable than any
9  of the aforementioned affidavits excluded by courts under the
10 sham affidavit rule.  In a case such as this, where the deponent
11 remembers almost nothing about the events central to the case
12 during his deposition, but suddenly recalls those same events
13 with perfect clarity in his declaration in opposition to summary
14 judgment without any credible explanation as to how his
15 recollection was refreshed, the disparity between the affidavit
16 and deposition is so extreme that the court must regard the
17 differences between the two as contradictions.  <u>See</u> <u>Mitchael</u>, 179
18 F.3d at 854-55.

19      Yeager has failed to "provide[] a sufficient
20 explanation for the contradiction" between his deposition
21 testimony, where he was unable to remember almost anything about
22 the details of this action, and his declaration where those
23 details are suddenly perfectly clear.  <u>Martinez v. Marin Sanitary</u>
24 <u>Serv.</u>, 349 F. Supp. 2d 1234, 1242 (N.D. Cal. 2004).  There was
25 nothing confusing about the questions posed to Yeager.  The clear
26 disparity between the sweeping lack of knowledge of Yeager at his
27 deposition and the information presented in his declaration
28 leaves no conclusion other than that his declaration is a self-

1  serving attempt to manufacture issues of fact to defeat summary

2  judgement.  Accordingly, the court will disregard the

3  contradictions between Yeager's deposition testimony and his

4  Declaration when evaluating defendants' motion for summary

5  judgment.

6         B.  Victoria Yeager Declaration

7         Defendants additionally contend that various statements

8  made by Victoria Yeager in her Declaration in opposition to the

9  motion for summary judgment contradict both her earlier

10  statements and plaintiffs' responses to interrogatories during

11  discovery.  Throughout the various iterations of their complaint,

12  plaintiffs have consistently alleged that defendants agreed to

13  provide plaintiffs with one-third of the Leiston Legends prints

14  signed at the Gathering of Aces event.  (See Original Compl. ¶¶

15  24, 27; First Am. Compl. ¶¶ 24, 27; SAC ¶¶ 25, 28.)  In addition,

16  in their interrogatory responses plaintiffs continued to advocate

17  that the agreement between the Bowlins and Yeager "provided that

18  GENERAL YEAGER would appear and speak at the [Tribute to Aces] .

19  . . and would be entitled to retain one-third (1/3) of [the]

20  signed lithographs for his own use." (Noonan Decl. Ex. E.)

21  Plaintiffs did not supplement or correct these discovery

22  responses pursuant to Rule 26(e).

23         In her Declaration, Victoria Yeager now contends that

24  she knew at the time of the signing of the Leiston Legends prints

25  that the Bowlins wanted to give the Yeagers 100 prints and that

26  in response the Yeagers "said to hold onto the other 200 and

27  maybe [the Bowlins] could sell them for" the Yeagers. (V. Yeager

28  Decl. ¶ 15.)  While there is tension between this statement and

11

1 the previous allegations by plaintiffs, Victoria Yeager is not a

2 named plaintiff in this action.   As such, unlike in <u>Wasco</u>

3 <u>Products, Inc. v. Southwall Technologies, Inc.</u>, 25 F.3d 989 (9th

4 Cir. 2006), plaintiffs have not presented a new theory of

5 liability based upon Victoria Yeager's declaration.   In fact, at

6 no point in plaintiffs' Opposition to this motion do they advance

7 Victoria Yeager's theory of the Leiston Legends agreement.

8 Accordingly, the court finds it unnecessary to strike this

9 portion of Victoria Yeager's declaration.   Plaintiffs remain

10 bound by their responses to defendants' interrogatories and

11 admissions, irrespective of Victoria Yeager's declaration.   <u>See</u>

12 <u>Wasco Products</u>, 25 F.3d at 992; <u>Conlon v. U.S.</u>, 474 F.3d 616,

13 621-22 (9th Cir. 2007); <u>School Dist. No. 1J, Multnomah County,</u>

14 <u>Or. v. AC&S, Inc</u>., 5 F.3d 1255, 1264 (9th Cir. 1993).

15 IV.   <u>Relevant Facts</u>

16         Excluding the evidence to which the court has sustained

17 the parties' objections above, and disregarding those portions of

18 the Yeager declaration which are contradicted by his deposition

19 testimony as discussed above, the following facts are undisputed.

20         Yeager is a well-known figure in American aviation

21 history.  (Second Am. Compl. ("SAC") ¶¶ 15-17.)  Connie and Ed

22 Bowlin ("the Bowlins") are retired Delta Airlines captains who

23 are active in the aviation community.  (Bowlin Decl. ¶¶ 5-13.)

24 The Bowlins are owners of Aviation Autographs, a non-incorporated

25 Georgia business entity that sells and markets aviation

26 memorabilia, and B&A, a Georgia corporation in the business of

27 aviation sales and consulting.  (SAC ¶¶ 7, 11-12.)  The Bowlins

28 met Yeager in the mid 1980s and became friends with him.  (Bowlin

12

1   Decl. ¶¶ 18-20; Gen. Yeager Dep. 56:23-57:3, 60:20-61:14, 61:20-
2   62:9.)

3         Defendant David McFarland met Yeager through the
4   "Gathering of the Eagles" program, which was initiated and
5   organized by McFarland beginning in 1982. (McFarland Decl. ¶¶
6   12-20.)   The Gathering of the Eagles brought distinguished
7   aviators to the Air Command and Staff College ("ACSC") at Maxwell
8   Air Force Base to give talks to the ACSC class. (Id.) Yeager
9   attended all of the Gathering of the Eagles events coordinated by
10  McFarland as an "Eagle." (Id. ¶ 20; Gen. Yeager Depo.
11  25:11-28:24.) The program was funded through the painting,
12  production, and sale of a limited number of lithographic prints
13  signed by Eagles. (SAC ¶ 20; McFarland Decl. ¶ 14.)   Additional
14  financial support for the program was provided not by the ACSC
15  itself, but by the ACSC Foundation and the International
16  Association of Eagles, Inc. ("IAE"). (Statement of Undisputed
17  Facts ("UF") 14-19.)

18        McFarland accumulated a substantial collection of
19  aviation memorabilia through the Gathering of Eagles and did not
20  have the means to market the merchandise. (McFarland Decl. ¶ 32;
21  Bowlin Decl. ¶ 23.) As a result, the Bowlins and McFarland began
22  discussing selling the memorabilia through a website in 2000.
23  (Id.) The Bowlins created Aviation Autographs and its website,
24  www.aviationautographs.com, in the summer of 2000. (Bowlin Decl.
25  ¶ 23.) In June 2000, IAE and McFarland entered into a marketing
26  agreement with Aviation Autographs with respect to the Gathering
27  of the Eagles lithographs. (McFarland Decl. ¶ 33, Ex. D; Bowlin
28  Decl. ¶ 24.)

1    During this time period, Yeager wanted to market three

2    items that he developed and signed in conjunction with McFarland

3    and Yeager, Inc.[5]: a lithograph known as the "Hey Pard" print,

4    which depicts Yeager breaking the sound barrier; a lithograph

5    known as the "F-15" print, which depicts this same event; and a

6    series of commemorative stamped envelopes known as the "First Day

7    Covers," which were letters with a canceled stamp from Edwards

8    Air Force Base, where an event celebrating the 50th anniversary

9    of the breaking of the sound barrier was held.  (McFarland Decl.

10   ¶¶ 28-31; Bowlin Decl. ¶ 27, Donald Yeager Decl. ¶ 6, Exs. A, B;

11   Noonan Decl. ¶¶ 17, 19 Exs. O, Q.)  Yeager originally authorized

12   McFarland to market these items until Yeager reached an oral

13   agreement with Aviation Autographs to sell them for a fifty-fifty

14   split of the proceeds.[6]  (Bowlin Decl. ¶ 26.)  Aviation

15   Autographs then began marketing and selling these prints on their

16   website and provided Yeager with regular summaries concerning

17   sales of these prints from 2000 through 2004.  (Bowlin Decl. ¶¶

18   52-54, 75-81; Noonan Decl. ¶ 18, Ex. P.)

19   In 2003, Yeager was invited to an event coordinated by

20   the Bowlins called the "Tribute to Aces."  The idea for the

21   Tribute to Aces developed from discussions between the Bowlins, a

22   Georgia developer Mike Ciochetti, and famed aviator General Tex

23   Hill.  (V. Yeager Depo. 44:10-45:25.)  Ciochetti and Hill

24   ───────────────

25   [5]    Yeager, Inc. was a corporation set up by Yeager and his
     first wife, Glennis Yeager, for the benefit of their children.
26   The corporation is presently run by the children of Yeager.

27   [6]    A discrete number of prints were sold to a collector in
     bulk and were subject to slightly different terms, with 40% of
28   proceeds going to Yeager, 40% to Aviation Autographs, and 20% to
     McFarland.  (Bowlin Decl. ¶ 26.)

arranged for famous aviators, including Yeager, to come to
Georgia to dedicate roads named after each of them in a housing
development planned by Ciochetti. (Anderson Decl. ¶ 9; V. Yeager
Depo. 44:10-47:6.)

The Bowlins formally coordinated the Tribute to Aces,
which included the dedication of the roads, a symposium at which
the "Aces"--the aviation legends in attendance--would speak, and
the signing of a number of lithographic prints by the attending
Aces. (Bowlin Decl. ¶ 41; Anderson Decl. ¶ 9.) Connie Bowlin
sent each attending Ace a two-page letter explaining the
background of the event, that an artist would be creating prints
for each Ace to sign, and that Aviation Autographs would sell
these prints. (Bowlin Decl. ¶¶ 31-32, Ex. 9.) Each Ace
negotiated his own deal with respect to the prints. Victoria
Yeager, Yeager's current wife, claims that Yeager made a deal to
receive one-third of the lithographs Connie Bowlin said were
being produced. (V. Yeager Depo. 106:16-18.) The Bowlins
contend the agreement was actually for Yeager to receive 100
prints, which Connie Bowlin confirmed with Yeager at an air show
in Detroit in August 2003. (Bowlin Decl. ¶¶ 38-39.) Plaintiffs
also contend that the Bowlins indicated the money from these
lithographs would be used to pay the Aces travel expenses and the
rest would go to charity, while defendants argue that plaintiffs
have not shown any indication of the existence of such an
agreement. (V. Yeager Depo. 107:13-18; Bowlin Decl. ¶¶ 38-39.)

Yeager attended the Gathering of Aces event in October
2003, including the symposium and dedication of a street sign
bearing his name. (Bowlin Decl. ¶¶ 40-42, Ex. 25; Anderson Decl.

1   ¶ 9; V. Yeager Depo. 46:7-47:6.)  Yeager signed approximately 900

2   prints of the lithograph made for him at the event, known as the

3   Leiston Legends print, at the Bowlins' home.  (SAC ¶ 26; Bowlin

4   Decl. ¶ 43; V. Yeager Depo. 39:24-41:4.)  Yeager was provided

5   with 100 prints from the event, which were shipped to him

6   directly from the artist.  (Bowlin Decl. ¶ 43, Ex. 26.)

7          The Yeagers were reimbursed for a number of travel

8   expenses associated with the Gathering of Aces event by October

9   of 2003.  (V. Yeager Depo. 35:9-36:14.)  On October 14, 2003,

10  Victoria Yeager sent an email to the Bowlins concerning the

11  disposition of the extra prints signed by Yeager.  (Bowlin Decl.

12  ¶ 44; Exs. 27, 28; V. Yeager Depo. 141:11-143:6.)  Connie Bowlin

13  responded that 100 of the prints went to Yeager, 100 went to Jack

14  Roush, who made two air craft available for the Tribute to Aces,

15  200 went to the Bowlins, and the rest were distributed among

16  volunteers or kept by the artist.  (Id.)  In December 2003,

17  Yeager acknowledged that he received 100 Leiston Legends prints

18  in a letter to Connie Bowlin.  (Bowlin Decl. ¶ 45, Ex. 29.)

19         In 2004, the Yeagers became involved in litigation

20  between themselves and Yeager's children and Yeager, Inc. in

21  California state court over the use of funds by Yeager, Inc.  In

22  this ligation, Yeager v. D'Angelo, et al., No. 68834, whether

23  Yeager or Yeager, Inc. owned the Hey Pard and F-15 prints and

24  First Day Covers was directly in dispute.[7]  (Noonan Decl. ¶¶ 17,

25  _____

26         [7]   The court will grant defendants' Request for Judicial
    Notice and Supplemental Request for Judicial Notice, as the
27  documents are all public documents of related court proceedings
    whose accuracy cannot be questioned.  See United States ex rel.
28  Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d
    244, 248 (9th Cir. 1992).

19, Exs. O, Q; D. Yeager Decl. ¶ 6, Exs. A, B.)  Between 2004 and 2005, Victoria Yeager sent several emails to Connie Bowlin requesting delivery of the Hey Pard, F-15, and First Day Covers, which were in the possession of Aviation Autographs, to Yeager. (Bowlin Decl. ¶¶ 55-81.)  In January 2005, the Bowlins refused to provide these items to the Yeagers, stating that given the ongoing litigation over ownership of the items they would prefer to maintain possession of the items until the final resolution of the state court action and would remove them for sale from the Aviation Autographs website.  (Bowlin Decl. ¶¶ 63-69.)

On February 7, 2005, the Bowlins received a letter from Steven Thomas, an attorney retained by the Yeagers from Sullivan & Cromwell LLP, who requested that the Bowlins deliver the prints in dispute as well as "all other merchandise with General Yeager's likeness to him" in exchange for indemnity.  (Bowlin Decl. ¶ 68, Ex. 47.)  In June 2005, Victoria Yeager sent the Bowlins a series of emails demanding to remove the First Day Covers as for sale from the Aviation Autographs website, as well as all pictures of Yeager and references to Yeager's name from the site.  (Bowlin Decl. ¶¶ 71-74.  Exs. 51-57.)  On August 16, 2005, Sullivan & Cromwell sent a cease and desist letter to the Bowlins, accusing them of "continued unauthorized and unlawful use of General Chuck Yeager's name, image and likeness . . . ." (Bowlin Decl. Ex. 58.)

On October 11, 2005, the referee in the state court action involving the Yeagers preliminarily ruled that Yeager, Inc., not Yeager, owned the Hey Pard and F-15 prints and the First Day Covers.  (D. Yeager Decl. ¶ 6, Exs. A, B.)   The state

17

court entered a final judgment adopting the referee's Statement
of Decision in <u>Yeager v. D'Angelo</u> on March 29, 2006.  (D. Yeager
Decl. ¶ 6, Exs. A, B; Noonan Decl. ¶¶ 17, 19, Exs. O, Q.)
Yeager, Inc.'s ownership of the Hey Pard and F-15 prints and
First Day Covers was affirmed by the California Court of Appeal
on August 22, 2008.  (Noonan Decl ¶ 20, Ex. R.)  The Bowlins
subsequently ceased selling these products and returned them to
Yeager, Inc.  (Bowlin Decl. ¶ 54; D. Yeager Decl. ¶ 7.)

         Victoria Yeager continued to send emails requesting
that the Bowlins remove all references to Yeager from the
Aviation Autographs website through October 2005.  (Bowlin Decl.
¶¶ 80-81.)  The Aviation Autographs website contains several
references to Yeager.  The Aviation Autographs home page contains
one such reference to Yeager:

> www.AviationAutographs.com proudly offers rare
> lithographs, books, prints, photos and "one of a kind"
> collectables to aviation enthusiasts, all of which
> contain the original signatures of the history's most
> famous people!  Commissioned and/or collected over the
> past 20 years by a single collector. There are several
> hundred historic items, offered for the first time to
> the public.  Don't miss the opportunity to own a piece
> of history!  Famous aviators autographs add priceless
> value to these unique items. You will find aviation
> heroes, such as General Charles E Chuck Yeager, Col.
> C.E. Bud Anderson, General Tex Hill, Gunther Rall, Bob
> Hoover and more.  Our personal friendship with many of
> these living legends gives us a unique opportunity to

1    bring them closer to you.

2    (Bowlin Decl. ¶ 85; Noonan Decl. ¶ 8, Ex. G.)  The home page also

3    makes reference to the Tribute to Aces event, and contains a

4    picture of "[f]our of the five Aces who attended," but does not

5    mention Yeager or contain his picture. (Bowlin Decl. ¶ 86.)  The

6    home page previously had displayed a statement, added in October

7    2003, which mentioned Yeager's attendance at the Tribute to Aces

8    event.  (Id.)  The home page was last edited with respect to

9    Yeager in August 2005, when Connie Bowlin cropped a picture to

10   remove Yeager from the photograph and deleted the reference to

11   him as an attending Ace.  (Id.)

12        The "About Aviation Autographs" page contains a picture

13   of Yeager and Gunther Rall with the caption "Left, Chuck Yeager

14   and Gunther Rall sort through our selection of signature edition

15   collectibles on other combat aces."  (Bowlin Decl. ¶ 87; Noonan

16   Decl. ¶ 8, Ex. G.)  The page also mentions that the Bowlins " are

17   best of friends with aviation legend Gen. Chuck Yeager and are

18   selling items from his personal collection." (Id.)  The text on

19   the page was authored by Ray Fowler, an F-16 fighter pilot, and

20   has not been changed since June 2000, when the website first went

21   online.  (Bowlin Decl. ¶ 87.)

22        The "Tribute to Aces" page contains one reference to

23   Yeager, thanking him and the other aviation legends who attended

24   the Tribute to Aces.  (Bowlin Decl. ¶ 88; Noonan Decl. ¶ 8, Ex.

25   G.)  The page also describes the Tribute to Aces event and

26   identifies the four prints for sale from the event, including the

27   Leiston Legends print.  (Id.)  The last revision of the page that

28   made reference to Yeager was made in October 2003, when the

19

Bowlins added the aforementioned sentence thanking Yeager for his attendance at the Tribute to Aces.  (<u>Id.</u>)

Yeager is additionally referenced on the "News and Current Events" page on defendants' website.  The page refers to Yeager directly once in an entry describing the Tribute to Aces, listing him as an attendee of the event.  (Bowlin Decl. ¶ 90.) This entry was added in 2003 and has not been changed since that time.  (<u>Id.</u>)  The page also references the crash of the Bowlins' T-6 airplane.  (<u>Id.</u>)  Although Yeager was flying the Bowlins' plane when it crashed, he is not mentioned by name in the entry. (<u>Id.</u>)

Yeager is lastly referenced on pages selling various memorabilia relating to Yeager that are not owned by Yeager. (SAC ¶¶ 54, 59.)  Plaintiffs have admitted they have no right to restrict the sale of these items and are not entitled to damages in connection with the sale of these products.  (Noonan Decl. ¶¶ 6-7, Exs. E, F.)

Yeager's name also appears in the metadata of the Aviation Autographs website.  (Bowlin Decl. ¶ 89.)  Metadata entries are not displayed to the viewers of the website, but are contained in the source script of a web page and utilized by internet search engines to locate and organize internet websites in response to inquiries by search engine users.  Defendants have made no changes to the references to Yeager in the metadata of their site since October 2001.  (<u>Id.</u>)

On January 14, 2008, plaintiffs filed their initial complaint in this action.  (Docket No. 1.)  After this court granted in part defendants' motion to dismiss the Complaint,

1   plaintiffs filed their SAC on March 3, 2009.  (Docket Nos. 17,

2   77.)  The SAC alleges eleven causes of action against defendants

3   relating to their sale of lithographs for plaintiffs and usage of

4   the likeness and image of Yeager: 1) breach of the California

5   common law right to privacy/right to control publicity and

6   likeness; 2) violation of California Civil Code section 3344

7   (statutory right of publicity); 3) violation of the Lanham Act,

8   15 U.S.C. § 1125(a), for false endorsement; 4) violation of the

9   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.

10  Code §§ 17200-17210; 5) violation of the California False

11  Advertising Act, Cal. Bus. & Prof. Code § 17500; 6) fraud; 7)

12  breach of oral contract; 8) breach of written contract; 9) unjust

13  enrichment; 10) accounting; and 11) equitable rescission.  The

14  Bowlins, Aviation Autographs, and B&A now move for summary

15  judgment on all claims pursuant to Rule 56.

16  V.   DISCUSSION

17       A.   Time-Barred Claims

18            Plaintiffs' action was filed in January of 2008, while

19  many of the events giving rise to the claim occurred between 2000

20  and 2004.  Defendants have accordingly challenged many of

21  plaintiffs' claims as time-barred.  The statute of limitations

22  generally begins to run at "the time when the cause of action is

23  complete with all its elements.  An exception is the discovery

24  rule, which postpones accrual of a cause of action until . . .

25  [the plaintiff] suspects, or has reason to suspect, a factual

26  basis for its elements."  Nogart v. Upjohn Co., 21 Cal. 4th 383,

27  389 (1999); Apple Valley Unified School Dist. V. Vavrinek, Trine,

28  Day & Co., 98 Cal. App. 4th 934, 943 (2002).

1              1.   <u>Breach of Oral Contract</u>

2              The statute of limitations for breach of oral contract

3   under California law is two years.  Cal. Civ. Proc. Code § 339.

4   A cause of action on an oral contract accrues, and the statute of

5   limitations begins to run, at the time the contract is breached.

6   <u>Cochran v. Cochran</u>, 56 Cal. App. 4th 1115, 1124 (1997).

7   Plaintiffs allege breaches of multiple oral agreements with

8   defendants.  Specifically, plaintiffs allege that they were

9   inadequately compensated for the Leiston Legends prints and

10  travel to the Tribute to Aces weekend, that defendants breached

11  an oral agreement that all proceeds from the Tribute to Aces

12  weekend would go to charity, and that plaintiffs were not

13  adequately compensated with regards to the profits and proceeds

14  of the Hey Pard prints and First Day Covers.  (SAC ¶ 118.)

15             These breaches all should have been apparent to

16  plaintiffs between 2000 and at the latest in July 2004, putting

17  plaintiffs' claim well outside the statute of limitations.

18  Plaintiffs allege that defendants breached an oral contract with

19  Yeager with respect to the Legion Legends prints and the

20  Gathering of Aces when they (1) failed to provide one-third of

21  the Legion Legends prints to plaintiffs (2) did not pay

22  plaintiffs the royalties owed from the prints, (3) did not

23  reimburse Yeager for travel and lodging, and (4) did not give

24  funds from the lithograph to a charity as promised.  (<u>Id.</u> ¶

25  118(a).)  Plaintiffs would have been aware of any breaches

26  relating to the these events as early as October 2003, when

27  Yeager only received 100 prints from defendants, was not paid any

28  royalties, and did not allegedly receive adequate reimbursement

                              22

for travel expenses.  Victoria Yeager specifically asked about
what the Bowlins planned to do with the extra prints signed by
Yeager on October 14, 2003, putting her on notice of the Bowlins'
alleged breaches of the oral contract surrounding the Tribute to
Aces event such that she should have pursued litigation.  <u>See</u>
<u>Nogart</u>, 21 Cal 4th at 398 n.2.  As such, plaintiffs' breach of
oral contract claims related to the Leiston Legends prints and
Gathering of Aces events are time-barred.

        Plaintiffs' breach of oral contract claims related to
the Hey Pard and F-15 prints and First Day Covers are similarly
time-barred.  Plaintiffs allege that they were not provided with
adequate accounting of the profits from these prints and were not
adequately compensated for them by defendants.  (SAC ¶¶ 118 (c),
(d).)  However, defendants have provided evidence that plaintiffs
received regular accounting from the Bowlins through January of
2004, and that Victoria Yeager corresponded with the Bowlins
about Aviation Autographs's inventory at that time.  (Bowlin
Decl. ¶¶ 52-54, 75-81; Noonan Decl. ¶ 18, Ex. P.)  Additionally,
as previously noted by the court in its August 6, 2008 Order re:
defendants' motion to dismiss, plaintiffs themselves contended
that they were on notice of the breach of contract claim no later
than July 2004, well outside of the two year statute of
limitations period.  (<u>See</u> Docket No. 17; Docket No. 11, Pls.'
Mem. in Opp'n to Defs.' Mot. to Dismiss 7:4-6 ("The documents
attached and incorporated by [] [d]efendants show that []
[p]laintiffs were not provided with a detailed inventory and
report on commissions paid by [d]efendants until July 6, 2004 . .
. .") ; <u>id.</u> at 2:19-20 ("[T]he [judicially noticed] documents

23

clearly demonstrate [d]efendants did not provide the information

serving to put [p]laintiffs on notice of their [breach] claim

until July, 2004 . . . ."); id. at 7:7-8 (stating plaintiffs

"would not have been aware of the improper accounting and

financial underpayments until this point in time").[8]

At the latest the statute of limitations began running

for defendants' alleged breaches of oral contract in July 2004,

and accordingly plaintiffs' oral contract claim is time-barred.

2.   Fraud and Unjust Enrichment

The statute of limitations for fraud and unjust

enrichment is three years.  Cal. Civ. Code § 338(d); First

Nationwide Sav. v. Perry, 11 Cal. App. 4th 1657, 1670 (1992).

Plaintiffs' fraud claims are based upon the same actions by

defendants as those outlined in plaintiffs' breach of oral

contract claim.  In fact, plaintiffs do not distinguish their

arguments as to why plaintiffs satisfy the statute of limitations

for the contract claim and the fraud claim in their own

Opposition.  (See Pls.' Corrected Opp'n Mot. Summary Judgment

33:1-35:6.)  As previously discussed, plaintiffs were well aware

that they may have a fraud claim against defendants based on the

accountings they received, and communications with the Bowlins in

October 2003.  Plaintiffs even went so far as to hire counsel to

deal with the very issues before the court in August 2005.

---

[8]   Plaintiffs contend that the Bowlins' ongoing retention
of sales proceeds for the Leiston Legends prints is an ongoing
breach and that therefore that the statute of limitations
continues to run until their wrongful conduct is ceased.  This is
clearly incorrect, since the statute of limitations period would
never run on any fraud or breach of contract case until a
plaintiff's money was refunded, effectively nullifying the
statute of limitations.

1  Although plaintiffs may not have been aware of all facts

2  underlying their fraud claim, a plaintiff need not be aware of

3  all these specific facts and "may seek to learn such facts

4  through . . . pretrial discovery . . . ." <u>Norgart</u>, 21 Cal. 4th

5  at 398.  Accordingly, defendants were on notice of the facts

6  underlying the fraud at issue well over three years ago, and

7  their claims are time-barred as a result.

8          3.  <u>Privacy Claims</u>

9          Defendants contend that plaintiffs' first, second, and

10 third claims--breach of the California common law right to

11 privacy/right to control publicity and likeness; violation of

12 California Civil Code section 3344 (statutory right of

13 publicity); and violation of the Lanham Act, 15 U.S.C. § 1125(a),

14 for false endorsement--are time-barred because of the single

15 publication rule.

16         The single publication rule provides that "[n]o person

17 shall have more than one cause of action for damages for . . .

18 invasion of privacy or any other tort founded upon any single

19 publication or exhibition or utterance, such as any one issue of

20 a newspaper or book or magazine or any one presentation to an

21 audience or any one broadcast over radio or television or any one

22 exhibition of a motion picture."  Cal. Civ. Code § 3425.3.

23 "Under the single-publication rule, with respect to the statute

24 of limitations, publication generally is said to occur on the

25 'first general distribution of the publication to the public' . .

26 . . the period of limtations commences, regardless of when the

27 plaintiff secured a copy or became aware of the publication."

28 <u>Shively v. Bozanich</u>, 31 Cal. 4th 1230, 1245 (2003) (citations

25

1  omitted).

2         The applicable statute of limitations as to the first

3  and second claims regarding plaintiffs' right to privacy is two

4  years.  Cal. Civ. Proc. Code § 339; <u>Long v. Walt Disney Co.</u>, 116

5  Cal. App. 4th 868, 873 (2004); <u>Cusano v. Klein</u>, 264 F.3d 936,

6  949-50 (9th Cir. 2001).  The statute of limitations for

7  plaintiffs' third claim is less certain since the Lanham Act does

8  not contain its own statute of limitations provision.  The

9  general rule in the absence of such a provision is to borrow the

10 most analogous statute of limitations from state law.  <u>See</u> <u>Polar</u>

11 <u>Bear Prods., Inc. v. Timex Corp.</u>, 384 F.3d 700, 720 n. 17 (9th

12 Cir. 2004); <u>Jarrow Formulas, Inc. v. Nutrition Now, Inc.</u>, 304

13 F.3d 829, 836-37 (9th Cir. 2002).  Given the nature of

14 plaintiffs' allegations, the most analogous statute of

15 limitations from state law would be either the two-year statute

16 applicable to right to privacy claims, or the three-year statute

17 applicable to fraud claims.

18        Plaintiffs' claims are are based on statements on

19 defendants' website--which has been in existence since 2000.  The

20 single publication rule has been held to apply to statements

21 published on the internet.  <u>Traditional Cat Ass'n, Inc. v.</u>

22 <u>Gilbreath</u>, 118 Cal. App. 4th 392, 394 (2004); <u>see</u> <u>Oja v. U.S.</u>

23 <u>Army Corps of Engineers</u>, 440 F.3d 1122, 1131 (9th Cir. 2006).

24 Plaintiffs' website is a "single integrated publication" for

25 marketing aviation memorabilia and providing aviation related

26 news and information, and accordingly is protected by the single-

27 publication rule.  <u>See</u> <u>Christoff v. Nestle USA, Inc.</u>, 47 Cal. 4th

28 468, 482-83 (2009).  Many of the references to Yeager on

1  plaintiffs' website have been in existence since 2000, including
2  the references to Yeager on the home page, the "About Aviation
3  Autographs" page, and the references to Yeager in the website's
4  metadata.

5          Plaintiffs contend that the single publication rule
6  does not apply in this case because the rule does not apply when
7  a defendant engages in ongoing sales of a product for commercial
8  gain.  Plaintiffs argue that each sale of a product as to which
9  Yeager was mentioned restarted the statue of limitations.[9]  In
10 support of this contention, plaintiffs cite <u>Miller v. Collectors</u>
11 <u>Universe</u>, in which an authenticator's name was used without his
12 consent on 14,000 separate certificates of authenticity.  159
13 Cal. App. 4th 988, 998-99 (2008).  <u>Miller</u> held that each
14 certificate was intended for a different consumer in connection
15 with different products and therefore was not an "identical
16 communication or display of identical content to multiple
17 persons" protected by the singe publication rule.  <u>Id.</u> at 999.
18 However, this case is distinguishable because Aviation Autographs
19 does not display different individualized content to different
20 consumers, but rather displays an identical set of content to all
21 viewers of its website.

22         Furthermore, California courts have explicitly found
23 that the repeated sale of identical products is subject to the
24 single publication rule.  For example, in <u>Kanarek v. Bugliosi</u>,

25

26         [9]   At oral argument and in the declaration submitted by
27 Yeager, plaintiffs contend that the sale of the Leiston Legends
   print violated a trademark of Yeager.  However, plaintiffs have
28 presented no evidence of the existence of any trademarks
   supposedly held by Yeager.

1   the court noted that the sale of copies of the same edition of a

2   book is subject to the single publication rule.  108 Cal. App. 3d

3   at 332; see also Christoff, 47 Cal. 4th at 479 (noting the reason

4   for the single publication rule is that under a rule where the

5   statute of limitations restarts when each copy of a book is sold

6   would create the absurd result that "the Statute of Limitation

7   would never expire so long as a copy of such book remained in

8   stock and is made by the publisher the subject of a sale or

9   inspection by the public." (citations omitted)); Hebrew Acad. of

10  San Francisco v. Goldman, 42 Cal. 4th 883, 892 (2007) ("The

11  statute of limitations could be tolled indefinitely, perhaps

12  forever, under this approach.").

13       The end result of plaintiffs' interpretation would be

14  that the statute of limitations would never run on their claim so

15  long as the Bowlins' website remained in existence with

16  plaintiffs' items for sale.  This is the exact result the single

17  publication rule seeks to avoid.  Plaintiffs' argument that the

18  single publication rule is inapplicable is therefore without

19  merit.

20       Nevertheless, courts have held that the single

21  publication rule many not be available when a defendant

22  republishes information.  Kanarek v. Bugliosi, 108 Cal. App. 3d

23  327, 332 (1980).  Defendants admit that they altered their

24  website in October 2003 to add information about the Tribute to

25  Aces event, which constituted a republication of the information

26  about Yeager so as to restart the statute of limitations.  Id.

27  However, plaintiffs have provided no other evidence indicating

28  that defendants republished the information about Yeager at any

28

1  point in time after October 2003, when defendants added

2  information about the Tribute to Aces event.[10]   Accordingly, the

3  statute of limitations has run as to all of plaintiffs' privacy

4  causes of action relating to the use of plaintiffs' name on the

5  Aviation Autographs website.

6          Even if the single publication rule did not apply,

7  plaintiffs' privacy based claims are still time barred.

8  Defendants have proven that plaintiffs had actual notice of the

9  alleged privacy violations in August 2005, when plaintiffs had an

10 attorney from Sullivan & Cromwell send a cease and desist letter

11 to defendants and threaten litigation over the very same issues

12 before this court.  It is therefore clear that plaintiffs' claims

13 are well outside the statue of limitations, and accordingly the

14 court must grant defendants' motion for summary judgment on

15 plaintiffs' first, second, and third causes of action.

16          4.  Equitable Tolling

17          Plaintiffs also contend that their claims are subject

18 to equitable tolling because defendants induced plaintiffs not to

19 sue by promising to take the Hey Pard and F-15 prints and First

20 Day Covers off their website and entering into an agreement that

21 the Bowlins could use Yeager's name and image until the state

22 court proceedings involving the Yeagers were resolved.  (Pls.'

23 Opp'n Mot. Summary Judgment 37:7-13.)  Generally, federal courts

24 grant equitable relief from the statute of limitations in only

25 _____

26 [10]  While defendants removed Yeager's name from a
   discussion of the Tribute to Aces event on Aviation Autograph's
27 home page and cropped him out of a photograph, such minimal
   editing of information does not constitute a republication.  See
28 Traditional Cat Ass'n, 118 Cal. App. 4th at 404; Oja, 440 F.3d at
   1128, 1130-33.

1   two kinds of situations: (1) when delay in filing a claim is

2   excusable and does not unduly prejudice the defendant (equitable

3   tolling); or (2) when the defendant prevented the plaintiff from

4   asserting her claim by some kind of wrongful conduct (equitable

5   estoppel).  See Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178

6   (9th Cir. 2000).

7           Plaintiffs' argument for equitable estoppel is based on

8   the defendants' allegedly misleading conduct.  Indeed, plaintiffs

9   are not entitled to equitable tolling because equitable tolling

10  ceases once a claimant retains counsel because the claimant "has

11  gained the means of knowledge of her rights and can be charged

12  with constructive knowledge of the law's requirements."  Leorna

13  v. United States Dep't of State, 105 F.3d 548, 551 (9th Cir.

14  1997).  Since plaintiffs had counsel at least as early as August

15  2005 when a letter was sent from Sullivan & Cromwell to

16  defendants, the statute of limitations could not be tolled beyond

17  August 2005 in any event.  Additionally, as previously addressed,

18  plaintiffs were well aware of the actions at issue in the SAC

19  well over four years ago, and as such have not presented a

20  legitimate basis for equitable tolling.

21          Courts will toll the statute of limitations based on

22  equitable estoppel when the plaintiff is prevented from asserting

23  his claim due to the wrongful conduct of the defendant.  See

24  Irwin v. Department of Veteran Affairs, 498 U.S. 89, 96 (1990);

25  Santa Maria, 202 F.3d 1170 at 1178.  Factors which the court

26  should consider when deciding whether equitable estoppel should

27  be applied include:

28          (1) the plaintiff's actual and reasonable reliance on

                                30

1    the defendant's conduct or representations, (2)

2    evidence of improper purpose on the part of the

3    defendant, or of the defendant's actual or constructive

4    knowledge of the deceptive nature of its conduct, and

5    (3) the extent to which the purposes of the limitations

6    period have been satisfied.

7  Santa Maria, 202 F.3d at 1176; see also Johnson v. Henderson, 314

8  F.3d 409, 414 (9th Cir. 2002).  Equitable estoppel, then, may

9  come into play "if the defendant takes active steps to prevent

10 the plaintiff from suing in time."  Santa Maria, 202 F.3d at

11 1176-77.

12         While plaintiffs contend they need not show bad faith

13 on the part of defendants to invoke equitable estoppel, citing

14 Shaffer v. Debbas, 17 Cal. App. 4th 33 (1993), this court is not

15 bound by that decision.  The California Courts of Appeal are rife

16 with contradictory decisions, where judges openly disagree with

17 decisions by judges from other districts.  See, e.g., Lobrovich v.

18 Georgison, 144 Cal. App. 2d 567, 573-74 (1956) (finding the

19 presence of settlement negotiations does not entitle a party to

20 equitable estoppel).  This court instead is bound by the Ninth

21 Circuit's interpretation of the doctrine of equitable estoppel

22 under California law and accordingly will abide by it.  Moreover,

23 even if plaintiffs' interpretation is correct, defendants have

24 produced clear evidence indicating that plaintiffs did not rely

25 on any actions by defendants which "induced the plaintiff[s] to

26 refrain from instituting legal proceedings."  Shaffer, 17 Cal.

27 App. 4th at 43.

28         Plaintiffs have not shown that defendants took active

31

steps to prevent them from suing before the statute of
limitations period ended.  Plaintiffs have not provided any
evidence evincing the existence of any agreement between the
Bowlins and plaintiffs where plaintiffs promised to delay suing
until after the Yeagers' state court action was final.  In fact,
the evidence indicates that Victoria Yeager continued to
aggressively confront the Bowlins over ownership issues relating
to the Hey Pard and F-15 prints and First Day Covers and accused
the Bowlins of behaving unlawfully while the state court
litigation was ongoing.  (Bowlin Decl. Exs 34, 35, 37, 50, 53.)
The Yeagers obtained representation and continued to ask that the
items in the state court action be delivered to them throughout
2004 and 2005.  (Id. Exs. 47, 48.)  Victoria Yeager also
repeatedly insisted that the Bowlins cease to use any reference
to Yeager on their website.  (Id. Exs. 52-54, 56.)  Plaintiffs
were not waiting to pursue litigation against the Bowlins based
on their representations, but rather were continually objecting
to the Bowlins' practices and actively preparing for litigation
against them with the assistance of an attorney.

        There is also no evidence that the defendants misled
the plaintiffs into waiting for the statute of limitations to run
before suing.  The Bowlins did not instruct the Yeagers not to
take action against them, but simply stated that they would wait
for the state lawsuit to end before delivering the Hey Pard and
F-15 prints and First Day Covers to any party.  (Id. Ex. 49.)
Defendants did not engage in any aggressive action to induce
plaintiffs not to sue them that would warrant tolling the statute
of limitations.  See, e.g., Union Oil Co. of Cal. v. Greka Energy

32

1  Corp., 165 Cal. App. 4th 129, 138 (2008) (finding equitable
2  estoppel appropriate where defendant repeatedly engaged in
3  settlement talks with plaintiff and asked plaintiff to withhold
4  litigation until defendant resolved the matter).  The Bowlins
5  simply articulated their views on the legality of their position
6  to plaintiffs, which in no way deceived the plaintiffs into
7  delaying this action.

8         The alleged violations of plaintiffs' privacy rights
9  were vividly apparent on defendants' website since its inception
10 and plaintiffs were well aware of any contractual breaches by
11 defendants throughout 2003 and 2004.  Plaintiffs have presented
12 no evidence that indicates they reasonably relied on any
13 representations by defendants that induced them to delay from
14 filing this action until the statue of limitations had run.  In
15 fact, all evidence indicates that plaintiffs were preparing for
16 litigation and did not delay the filing of this action based on
17 the Bowlins' statements.  Accordingly, equitable tolling and
18 estoppel are inappropriate.

19       B.   Breach of Written Contract

20       Under California law, the elements of a claim for
21 breach of written contract are (1) the existence of a contract;
22 (2) plaintiffs' performance or excuse for nonperformance of the
23 contract; (3) defendants' breach of the contract; and (4)
24 resulting damages.  Armstrong Petroleum Corp., 116 Cal. App. 4th
25 at 1390.  Plaintiff has not provided any evidence indicating that
26 any written contract ever existed between plaintiffs and
27 defendants.  Plaintiff testified at his deposition that he
28 usually did business on a handshake basis and did not recall any

                                33

1  written contracts with defendants.  (Gen. Yeager Depo. 12:12-
2  13:15.)  Plaintiffs in fact conceded during discovery that no
3  such contracts exist, and neither General nor Victoria Yeager
4  could identify any such contract at their depositions.  (Noonan
5  Decl. Exs. E, F; Gen. Yeager Depo 12:12-13:15; V. Yeager Depo.
6  191:10-194:3.)  Accordingly, the court will grant defendants'
7  motion for summary judgment as to plaintiffs' breach of written
8  contract claim.

9       C.   Derivative Claims

10           1.   UCL Claim

11          The UCL prohibits any "unlawful, unfair or fraudulent
12 business act or practice." Cal. Bus. & Prof. Code § 17200.  It
13 incorporates other laws and treats violations of those laws as
14 unlawful business practices independently actionable under state
15 law.  Chabner v. United Omaha Life Ins. Co., 225 F.3d 1042, 1048
16 (9th Cir. 2000).  Plaintiffs' fourth claim for violation of the
17 UCL and is dependent on proof of a predicate violation of
18 plaintiffs' first three claims for breach of the common law right
19 to privacy, breach of California Civil Code section 3344, or of
20 the Lantham Act.  See Chabner v. United Omaha Life Ins. Co., 225
21 F.3d 1042, 1048 (9th Cir. 2000).  As these cause of action are
22 time-barred, they cannot be used at the basis for plaintiffs' UCL
23 claim.

24          In addition, a business practice may be "unfair or
25 fraudulent in violation of the UCL even if the practice does not
26 violate any law."  Olszewski v. Scripps Health, 30 Cal. 4th 798,
27 827 (2003).  With respect to fraudulent conduct, the UCL
28 prohibits any activity that is "likely to deceive" members of the

34

1  public.  <u>Puentes v. Wells Fargo Home Mortg., Inc.</u>, 160 Cal. App.

2  4th 638, 645 (2008).  Plaintiffs argue that even if their other

3  derivative claims fail, defendants' practices are still "unfair"

4  because their harm to plaintiffs outweighs the utility to

5  defendants.

6         However, any such claim would be time-barred as well,

7  as plaintiffs claims fail to meet the statute of limitations for

8  the UCL.  The UCL has a four-year statute of limitations.  Cal.

9  Bus. & Prof Code § 17208.  The UCL is subject to the single

10  publication rule, as it is based on the same publications that

11  underlie plaintiffs' privacy causes of action.  <u>See Baugh v. CBS,</u>

12  <u>Inc.</u>, 828 F. Supp. 745, 755-56 (N.D. Cal. 1993); <u>see</u> <u>also</u>, <u>Long</u>

13  <u>v. Walt Disney Co.</u>, 116 Cal. App. 4th 868, 873 (2004) (finding

14  that plaintiffs have not been allowed to circumvent the statute

15  of limitation based on the single publication rule by simply

16  pursuing another theory of relief based on the same publication).

17  Accordingly, as discussed previously, the statute of limitations

18  for plaintiffs' UCL claim began running in 2003, after the

19  information concerning the Tribute to Aces was added to

20  defendants' website.  <u>See Karl Storz Endoscopy-Am., Inc. v.</u>

21  <u>Surgical Tech., Inc.</u>, 285 F.3d 848, 857 (9th Cir. 2002) (finding

22  UCL claims "are subject to a four-year statute of limitations

23  which [begins] to run on the date the cause of action accrue[s],

24  not on the date of discovery."); <u>see also</u> <u>Rambus Inc. v. Samsung</u>

25  <u>Elecs. Co.</u>, Nos. C-05-02298 & C-05-00334, 2007 WL 39374, at *3

26  (N.D. Cal. Jan. 4, 2007).  As such, plaintiffs' claim is time

27  barred, as plaintiff may only have one cause of action to pursue

28  their claims based on plaintiffs' single publication, beginning

35

1    at the time of the last republication.

2        2.   False Advertising

3            California's False Advertising Law prohibits the
4    dissemination in any advertising media of any "statement"
5    concerning real or personal property offered for sale, "which is
6    untrue or misleading, and which is known, or which by the
7    exercise of reasonable care should be known, to be untrue or
8    misleading."  Cal. Bus. & Prof. Code § 17500.  The statements
9    underlying plaintiffs' false advertising claim are the same
10   references to Yeager on the Aviation Autographs website that are
11   involved in the plaintiffs' first three causes of action.  As
12   such, plaintiffs' false advertising claim is also subject to the
13   single publication rule.  See Baugh, 828 F. Supp. at 755-56;
14   Long, 116 Cal. App. 4th at 873.  As the False Advertising Law has
15   a statue of limitations of three years, Cal. Code Civ. Proc. §
16   338(a), plaintiffs' false advertising claim is also time-barred
17   for the same reason as plaintiffs' UCL claim.

18       3.   Accounting and Equitable Rescission

19           Plaintiffs' accounting and equitable rescission claims
20   are merely derivative of their fraud and contract claims.  See
21   Janis v. Cal. State Lottery Com., 68 Cal. App. 4th 824, 833-834
22   (1998) ("A right to an accounting is derivative; it must be based
23   on other claims."); Nakash v. Superior Court, 196 Cal. App. 3d
24   59, 70 (1987) (finding rescission is a remedy that is dependant
25   on another claim).  As defendants' motion for summary judgment
26   will be granted on those claims, the court must also grant
27   defendants' motion for summary judgment on these claims as well.

28           IT IS THEREFORE ORDERED that defendants' motion for

36

1   summary judgment be, and hereby the same is, GRANTED.

2           IT IS FURTHER ORDERED that plaintiffs' complaint be,

3   and the same hereby is, DISMISSED as to the remaining defendants.

4   DATED:  January 6, 2010

5

6                                    WILLIAM B. SHUBB

7                                    UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

37